IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2018 Session

## JILL SMOTHERS LUCCHESI v. EUGENE ANTHONY LUCCHESI

Appeal from the Circuit Court for Shelby County
No. CT-004818-13        Gina C. Higgins, Judge
———————————————

No. W2017-01864-COA-R3-CV
———————————————

In this divorce proceeding, the Husband appeals the trial court's reliance on certain evidence in valuing the marital assets, the classification and valuation of specific assets, and failure to recuse itself. Wife appeals the award to her of alimony *in solido* as being insufficient. After a thorough review of the record, we affirm the court's classification and valuation of the marital assets, with the exception of one, which we vacate and remand for further consideration; we reject Husband's argument that the court should have recused itself. We modify the award of alimony and remand the case for the court to consider whether an additional award of alimony is appropriate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, and Vacated and Modified in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Stuart Breakstone, Memphis, Tennessee, for the appellant, Eugene Anthony Lucchesi.

Mitchell D. Moskovitz, Zachary M. Moore, and Adam N. Cohen, Memphis, Tennessee, for the appellee, Jill Smothers Lucchesi.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Jill Lucchesi ("Wife") and Eugene Lucchesi ("Husband") were married in December 1994 in Shelby County. The couple had one son, born in October 2000. During the marriage, Husband was the operations manager and secretary/treasurer of Delta Wholesale Liquors ("Delta"), a family-owned liquor distributorship started by his

father. In addition to working at Delta, Husband bought, managed, and sold assets, investments, and businesses as a venture capitalist. At the time of the marriage, Wife worked as a special education teacher at a middle school. She left that job and earned an associate's degree in information technology in 2002; from 2003 through the time of trial, Wife worked sporadically selling real estate on a part time basis, never earning more than $20,000 per year.

On November 7, 2013, Wife filed a complaint for divorce, alleging inappropriate marital conduct and irreconcilable differences as grounds. Wife alleged that Husband "has an extensive history of abusing alcohol" and a "lengthy history of verbal and physical abuse of Wife"; she sought to be named primary residential parent of the parties' son and sought *pendente lite* and permanent alimony. Husband answered, denying the salient allegations in Wife's complaint and asserting that Wife had been "both physically and verbally abusive to him during the marriage"; Husband counterclaimed for divorce on the grounds of Wife's inappropriate marital conduct and irreconcilable differences. He sought to be named primary residential parent of the parties' child and to receive the marital home as alimony *in solido*.

After nearly three years of protracted litigation, trial was held over nine days in August and September 2016. Numerous witnesses testified, including Wife; the child's therapist; Husband; Husband's two brothers; William "Rob" Vance, a forensic accountant and economist, and business valuation analyst; and David Harris, a business evaluator and appraiser. The trial court entered a lengthy order on August 15, 2017, granting Wife a divorce on the grounds of inappropriate marital conduct. The court classified the parties' property as separate or marital, then valued and divided the marital assets and debts; awarded Wife alimony *in solido* in the amount of $200,000;[1] established a parenting plan;[2] awarded Wife "an additional sum of alimony *in solido* in the amount of . . . $200,000 . . . for her attorney's fees"; and held Husband in civil contempt for his failure to pay Wife $2,000 per month from February to August 2016 and for his failure to make necessary repairs to the marital residence, and ordered him to pay Wife $14,000 within 10 days of the entry of the decree.

Germane to our resolution of the issues in this appeal, the court made the following adverse credibility determination in its ruling:

The court finds that Husband and some of his witnesses lack credibility. The court finds that Husband has been evasive and less than truthful under

---

[1] The court stated it was making the award "in lieu of Husband paying alimony *in futuro* to Wife" and for the purpose of "assist[ing] Wife with the payment of litigation expenses incurred unnecessarily due to Husband's conduct of delay and failures to comply with repeated request[s] during the course of the trial."

[2] The parenting plan is not at issue in this appeal.

2

oath on multiple occasions including, but not limited to, providing false answers in his Answer to Interrogatories filed with this court on March 21, 2014; testifying untruthfully during the trial in this cause; and responding untruthfully in responsive pleadings filed with this court. In his Answer to Interrogatories filed with this court on March 21, 2014, regarding having a sexual relationship with J[.] E[.,] Husband was untruthful and Husband failed to disclose marital assets in other responses to discovery.

\*\*\*

Husband's antics throughout the trial in this matter caused this court to also question Husband's veracity. Husband frequently had vocal outbursts and made hand gestures to witnesses, including Wife during her testimony. This court and counsel for Husband frequently admonished Husband that his behavior was unacceptable in the courtroom, causing the court on one occasion to require Husband to step into the hallway for a period of approximately fifteen (15) minutes. Additionally, at one point during Wife's testimony, this court ordered Husband to remove himself from the line of sight of Wife as she testified, required him to sit by the court's clerk for a period of approximately one (1) hour.

With respect to the two awards of alimony *in solido*, the trial court later, *sua sponte*, amended the order, stating:

. . . Wife shall only be awarded the total sum of $200,000 as alimony *in solido*, rather than a total of $400,000, to assist Wife with payment of litigation expenses incurred unnecessarily due to Husband's conduct of delay and failure to comply with repeated requests during the course of the trial. Said sum of $200,000 as alimony *in solido* is not being awarded to Wife in the form of support. . . .

Husband appeals, stating the following issues for our review:

1.   The trial court erred in classifying all the appreciation in the value of Delta as marital property.
2.   The trial court abused its discretion in its ruling on countless evidentiary issues where said rulings affected the outcome of the trial.[3]

---

[3] Husband's arguments on appeal are focused on one evidentiary ruling that admitted a report prepared by Wife's expert witness, Rob Vance. Husband sought to exclude three pages of that report. We deal with this issue in conjunction with the third issue Husband raises in section III. C, *infra*.

3. The trial court erred in its valuation of the marital assets and liabilities.
4. The trial court abused its discretion in not recusing itself when it became apparent that it could not remain impartial.

Wife states the following additional issues for our review:

1. Did the trial court err by awarding Wife an insufficient amount of alimony *in solido*?
2. Should Husband be required to pay Wife's attorney fees and suit expenses on appeal?

## II. STANDARD OF REVIEW

Because this case was tried without a jury, our review of the trial court's factual findings is *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. Civ. P. 13(d). Our review of a trial court's conclusions of law is *de novo* upon the record with no presumption of correctness. *Tryon v. Saturn Corp.,* 254 S.W.3d 321, 327 (Tenn. 2008).

## III. ANALYSIS

### A. Recusal

As an initial matter, we address Husband's argument that this Court should reverse the rulings of the trial court and remand this case with instructions to transfer the case to another judge because the trial court "should have recused [it]self when it became apparent that it was not able to remain impartial in these proceedings." This argument is without merit.

Rule 10B of the Rules of the Tennessee Supreme Court sets forth the "procedures . . . [that] shall be employed to determine whether a judge should preside over a case." Tenn. Sup. Ct. Rule 10B. The Rule requires that a motion for the court to recuse itself be timely made, supported by a sworn affidavit, and that the motion state with specificity all factual and legal grounds supporting disqualification of the judge. After such a motion is made, the trial court is to promptly grant or deny the motion. Husband did not seek recusal of the trial judge in accordance with Rule 10B and, in the absence of a motion and ruling thereon by the court, there is nothing for this court to review.

4

**B. Classification of the Increase in the Value of Delta Stock as Marital Property**

Husband challenges the trial court's classification of the appreciation in value of his shares of Delta as marital property. It is undisputed that at the time of the marriage, Husband owned 103.25 shares of Delta; the trial court valued these shares at $75,000. It is also undisputed that Husband worked at Delta during the marriage, that he and his two brothers bought out the remaining shareholders in 1996, and that he sold his one-third interest in February 2012 for $3,699,983. Husband stipulated that Wife's role as a homemaker significantly contributed to the appreciation in value of the shares of Delta. The court concluded that the $3,624,984 increase in value of Husband's shares of Delta during the marriage was marital property, subject to equitable division. Husband argues that the increase in value of the stock was not due to any contribution or actions on his part, but rather that market forces caused the increase in value; he contends that he was not actively involved in Delta and "did not fulfill his role at Delta because he was too busy working his deals and running his other business ventures," and therefore, the increase in value is not marital property,

"The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). Our analysis is guided by Tennessee Code Annotated section 36-4-121(b)(1)(B)(i), which defines marital property to include income from and appreciation on separate property that accrues during the marriage where "each party substantially contributed to [the separate property's] preservation and appreciation." Thus, increases in the value of separate property during a marriage will not be considered marital property unless both parties substantially contributed to the appreciation in value of the property. *Keyt v. Keyt*, 244 S.W.3d 321, 328-29 (Tenn. 2007). "In order to be substantial, a spouse's contributions must be real and significant[; t]hey need not, however, be monetarily commensurate to the appreciation in the separate property's value, nor must they relate directly to the separate property at issue." *Yates v. Yates*, No. 02A01-9706-CH-00122, 1997 WL 746377, at *2 (Tenn. Ct. App. Dec. 4, 1997) (quoting *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. Ct. App. 1994). Accordingly, we focus on whether the record shows that Husband's contributions as an owner and employee of Delta are "real and significant" and whether they directly or indirectly caused the preservation and appreciation in the value of the separate property. *See Keyt*, 244 S.W.3d at 330.

The court devotes more than 7 pages of findings to this asset, discussing Husband's stipulation that Wife substantially contributed to Husband's separate property in accordance with section 36-4-121(b)(1)(B)(i), the positions Husband held at Delta, the redemption of three other siblings' shares of Delta stock in 1996, the sale of the business in 2012, Husband's role in that sale, and the conflicting valuations of the business proposed by the parties' experts. The court concluded its discussion as follows:

5

It is clear that both Husband and Wife substantially contributed to the preservation and appreciation of Husband's interest in Delta Wholesale. When the parties married on December 30, 1994, Husband was employed as vice president and operations manager for Delta Wholesale and, in this role, Husband handled communications and financial matters pertaining to the company and ran the company's inside operation. There is no question that each of the brothers had a defined role and Husband ran Delta Wholesale with his brothers and worked hard to grow Delta Wholesale into one of the largest wine and spirits distributors in Tennessee. When the three (3) brothers acquired their one-third (33.3%) interest in the company, arguably, it was operating at a loss. However, due to the efforts of Husband, Paul Lucchesi and Bill Lucchesi, the company grew significantly and, on February 20, 2012, each brother sold his interest in the company to Kahn Ventures, for Three Million Six Hundred Ninety-nine Thousand Nine Hundred Eighty-three Thousand Dollars ($3,699,983). Accordingly, from the date of the parties' marriage to February 2012, Husband's interest in Delta Wholesale appreciated from Seventy-five Thousand Dollars ($75,000) to Three Million Six Hundred Ninety-nine Thousand Nine Hundred Eighty-three Thousand Dollars ($3,699,983). Husband stipulated during the trial in this cause that Wife substantially contributed to the increase in Husband's separate property pursuant to T.C.A. 36-4-121(b)(1)(D). During the parties' marriage, Husband took an active role in the operations of Delta Wholesale and, therefore, substantially contributed to the preservation and appreciation of his stock in the company. Wife performed and contributed in accordance with her role as homemaker. Accordingly, this court finds that the appreciation of the value of Husband's stock in the company is marital property. Due to the proximity of this date to the date of the parties' marriage, this court finds that the value of Husband's 103.25 shares on the parties' date of marriage was Seventy-five Thousand Dollars ($75,000), and that this Seventy-five Thousand Dollars ($75,000) is Husband's separate property. Sixteen years later, in 2012, Husband sold the parties' one-third (33.3%) interest to Kahn Ventures for Three Million Six Hundred Ninety-nine Thousand Nine Hundred Eighty-three Thousand Dollars ($3,699,983), for an increase in the value of the stock during the parties' marriage, of Three Million Six Hundred Twenty-four Thousand Nine Hundred Eighty four Dollars ($3,624,984), which is found to be marital property due to both parties' substantial contribution to the preservation and appreciation of this stock.

The record shows that Husband held the title of Senior Vice President and Chief Operating Officer, handled communications with the buyers and brands, and handled the negotiations for the sale of the business in 2012. He was a member of the executive

6

management team and testified that he and his brothers ran Delta and worked hard to build on the success of their father. While the testimony at trial shows that Husband delegated much of his authority as operations manager, he remained a member of the executive management team that ultimately made the decision to cut expenses, raise prices, and expand the brands Delta carried. Husband's testimony also shows that he played a part in the sale of the company by engaging in negotiations on behalf of Delta. While Husband testified that "it was more of a collective group of the three of us deciding what price do we want to sell it," Husband's brother Bill testified that Husband handled the negotiations with Kahn Ventures on behalf of the brothers.

This evidence supports the conclusion that Husband's role at Delta included the authority to delegate power and to engage in negotiations that led to the profitable sale of the business; the evidence does not preponderate against the court's finding that his efforts substantially contributed to the appreciation in the value of Delta stock. In like manner, the parties have stipulated that Wife's efforts as a homemaker substantially contributed to the appreciation of marital assets. The court did not err in holding that the increase in value of Husband's shares in Delta was marital property subject to equitable division.

### C. Valuation of Certain Marital Assets

Husband contends that the court erred in its valuation of several marital assets, specifically several pieces of real estate,[4] a business he calls CGN Energy, a real estate investment called "Investec 1407 Union Partnership," an ownership interest in LGR Beverage Group, a credit union account, and a security interest in a patent. As we consider his arguments, we bear in mind our standard of review announced in *Wallace v. Wallace*:

> The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

---

[4] The real estate at issue consists of properties located in Shelby, Cheatham and Hardin counties. Those in Shelby County are referred to as 3433 Forest Hill, 5055 Simsbury, 1284 Snowden, 3138 Carnes, and three condominiums, two of which were located on Quince Road; the property in Cheatham County is Lot 41A Pleasant View; and in Hardin County is a cabin and adjoining lot on Brittany Cove. With respect to the property at 5055 Simsbury, Husband has not raised the erroneous classification of this property in his statement of issues on appeal and addresses it along with the other properties in his argument regarding the valuation of the real estate; in the course of that argument he argues briefly that it was incorrectly classified as marital property when it should have been classified as separate property. We deem any argument relative to the classification of this property to be waived. *See* Tenn. R. App. P. 13(b).

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)

The court adopted the opinion of Wife's expert, Mr. Vance, as to the value of the real property assets at issue, which were based on the appraisals made by the county tax assessor in its assessment of each parcel or condominium unit. Husband contends that the court erred in adopting these values because Mr. Vance "was not qualified in the field of real estate appraisals."

"Generally, questions pertaining to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion, and the trial court's ruling admitting or excluding expert testimony may be overturned only if the court abused its discretion." *City of Pulaski v. Morris,* No. M2010-00047-COA-R3-CV, 2010 WL 3732161, at *3 (Tenn. Ct. App. Sept. 23, 2010) (citing *Brown v. Crown Equipment Co.,* 181 S.W.3d 268, 273 (Tenn. 2005)). The weight to be given to an expert opinion and the resolution of legitimate, competing expert views are matters appropriately entrusted to the trier of fact. *Id.*

With respect to the real estate valuations, Mr. Vance testified that he used the 2015 tax assessments by the Shelby County and Cheatham County Tax Assessors as the basis for his opinion of those properties' value. For the Brittany Cove properties in Hardin County, Mr. Vance utilized the State of Tennessee's Comptroller of the Treasury's Real Estate Assessment Data website to examine both of the properties; the report from that website states that it is for the 2016 tax year and lists the "Total Market Appraisal" value of each property, based upon a 2013 reappraisal.

The use of a tax appraisal to value a property has been held to be competent evidence of value of real property. *See Hancock v. Hancock,* No. E1999-01003-COA-R3-CV, 2000 WL 224366, at *3 (Tenn. Ct. App. Feb. 28, 2000).[5] The tax appraisals for the respective properties were admitted into evidence without objection as Mr. Vance discussed each property. The testimony of Mr. Vance cited by Husband in his brief does

---

[5] In *Hancock v. Hancock*, "the Trial Court considered the three alternative valuations [as to the value of the parties' home] presented at trial (Husband's guess, Wife's guess, the tax appraisal), and chose to accept the tax valuation." No. E1999-01003-COA-R3-CV, 2000 WL 224366, at *3 (Tenn. Ct. App. Feb. 28, 2000). This Court held that the trial court did not abuse its discretion in valuing the marital home according to the tax appraisal. *Id.*

not reveal a lack of trustworthiness in the underlying tax appraisals, such that we could conclude that the trial court abused its discretion in admitting Mr. Vance's opinion of value; rather, in the testimony, Mr. Vance merely identifies the source and content of the particular records upon which he based his opinions.[6]  Other evidence of value was presented by Husband and consisted of his opinion of fair market value, based on the condition of the property; his proposed value was lower than that set by the court. Inasmuch as the values set by the court were within the range of values presented, we find no error in the court's adoption of Mr. Vance's opinions of 5055 Simsbury, 1284 Snowden, 3138 Carnes, and Lot 41A Pleasant View. *See Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997).

Husband raises additional issues with respect to the court's valuation of 3433 Forest Hill, condominiums located on Quince Road, and a cabin and adjoining lot on Brittany Cove near Pickwick Lake.

### a.) 3433 Forest Hill

The trial court valued this property at $816,600; Husband contests this valuation, citing his testimony that the property is worth $465,000 due to it being in "extremely poor condition."  Husband also argues that the court erred in not taking into consideration a second mortgage he had purportedly taken out on the property.

The court specifically held that it "shall not include a debt in the amount of Two Hundred Thousand Dollars ($200,000) to Trust One Bank as Husband has failed to introduce any evidence related to the current balance of said debt."  From our review of the record, Husband introduced a $200,000 promissory note and deed of trust, both of which were executed in August 2010.  The deed of trust does not show that it was recorded but states that the balance was due and payable on August 17, 2014.  Wife contends that Husband's testimony and the supporting documentation of this alleged debt "were highly suspect," citing, *inter alia*, Husband's testimony that he never made any payments on the note, notwithstanding the fact that it called for payments of interest until maturity.  Given the adverse credibility finding the court made with respect to Husband and his failure to introduce proof that the indebtedness still existed when he testified in 2016, we find no error in the court's disregard of Husband's testimony about this alleged mortgage.

---

[6] At trial and on appeal Husband contends that Mr. Vance was not competent to testify as to the value of real estate because such testimony was outside his area of expertise; the court overruled the objection, holding that Husband would be able to cross-examine Mr. Vance on those matters, which his counsel proceeded to do.  Counsel did not dispute Mr. Vance's qualifications as an expert and the court accepted him as such.  As explained herein, we find no error in Mr. Vance's utilization of the tax appraisals as the basis of his opinions of value and no error in the court's adoption of those values for the real property. *See* Tenn. R. Evid. 703.

The Shelby County Tax Assessor's 2015 appraisal of this piece of property is $816,600. Thus, the valuation of the property was within the range of values presented, and we affirm the court's valuation. *See Watters*, 959 S.W.2d at 589.

### b.) Properties owned by Atled Investments, LLC

Husband and his two brothers each own one-third of Atled Investments, LLC, which owns several pieces of real estate, specifically, two condominiums located at 5676 and 5718 Quince Road and a cabin and adjoining lot on Brittany Cove near Pickwick Lake. Wife alleged that a third, unnamed condominium was owned by Atled. The trial court adopted Mr. Vance's $67,500 and $52,500 valuation of the Quince Road condominiums and $60,000 valuation of the unnamed condominium. Consistent with the opinion of Mr. Vance, the valuation of the property at Brittany Cove was set at $196,300 for the cabin and $25,000 for the adjoining lot.

Husband argues that the values assigned to the properties at 5676 Quince Road and at Brittany Cove do not take into account the mortgages on those properties; Husband admitted into evidence a balance sheet listing the marital assets and liabilities, which shows a $56,164 mortgage on the property at 5676 Quince Road and an $80,000 mortgage on the Britney Cove property. As an initial matter, we note that the court treated the real estate owned by Atled as if the parcels themselves were marital property, instead of valuing and dividing Husband's one-third interest in Atled. Neither party raises this as a concern on appeal and our resolution of Husband's objection to the valuation is not affected by the court's action in this regard.

In his argument Husband conflates the value of marital property with the debt encumbering the property; he incorrectly argues that debt should be considered in establishing the value. Value of marital assets, however, is established separate from and irrespective of marital debt; after the court divides the assets, it divides the debt, which in most circumstances will follow the asset. *See Mansfield v. Mansfield*, No. 01A019412CH0058, 1995 WL 643329, at *9 (Tenn. Ct. App. Nov. 3, 1995); *Hanover v. Hanover*, 775 S.W.2d 612, 614 (Tenn. Ct. App. 1989). In the final decree, when dividing the marital assets, the court used one-third of the values of the properties as the value received by Husband; in dividing the marital debt, the court assigned one-third of the Atled debt as Husband's responsibility. Accordingly, the court did not err in its valuation of these properties in this regard.

What the parties refer to as the "unnamed condominium" was valued at $60,000 and awarded to Husband. He contends that the court erred in including this asset as marital property because "Atled never owned a condominium other than the two on Quince that it currently owns"; he cites his testimony as well as that of both of his brothers in support. In contrast, Mr. Vance testified that the condominium was listed on Atled's 2014 tax return and that he got the value by averaging the values of the other

10

condominiums. Also, Exhibit 25 contains numerous years' tax returns and related schedules for Atled, and includes documents entitled "Federal Asset Report" for fiscal years ending December 31, 2014 and December 31, 2015; both reports list three condominiums.

In the portion of the decree where the court identifies marital assets, the court states that "Husband submits that the unnamed condominium no longer exists and has been sold . . . [but that] Husband introduced no proof evidencing the sale. . . "; after acknowledging the information on the tax returns, the court held that "[t]his property no longer exists and the likelihood [is] that the listing was an error." Notwithstanding these statements, the court included the condominium in its division of marital property. We cannot resolve the seeming inconsistency between the two holdings on the record before us; consequently, we vacate this holding and remand the issue for the court to determine whether this condominium was a marital asset on the date of trial and, if so, to value the asset and make such adjustments to the overall division of property as may be necessary.

c.) W.M. Barr

This issue involves the valuation of Husband's interest in royalties generated from a patent, which the trial court valued at $61,250, or 35 percent of a $175,000 proposal offered by W. M. Barr, the manufacturer of the product protected by the patent. Husband argues on appeal, as he did at trial, that there is no competent proof of value upon which the court could rely. The record shows that Miracle Shield Partnership, composed of four individuals, is the owner of a patent; that Husband owns a security interest in the patent, which includes the right to license the patent; and that W.M. Barr is a manufacturer which holds the rights to manufacture products protected the patent.[7]

Various exhibits demonstrate that Husband received hundreds of thousands of dollars in royalties from W.M. Barr in 2013 and 2014 and that W.M. Barr offered him $175,000 in 2016 to extinguish his royalty rights, to transfer to Barr any and all intellectual property rights in the technology he held, and to release any claims he held in those rights. Husband testified that he and his partners discussed the offer but decided to reject it and have contemplated pursuing litigation. Mr. Vance valued the asset based on 35 percent of the offer.[8]

---

[7] Although there is no agreement between the partnership and Husband in the record, in their briefs on appeal, the parties agree that Husband's security interest is 35 percent of the royalties payable to the partnership; the trial court so found.

[8] Mr. Vance explained that he valued Husband's interest in the royalties at 35% of the offer because, on his tax returns, Husband indicated that he distributed 65% of the royalties to "somebody else."

On appeal, Husband contends that "[t]here was no competent evidence that the trial court could reasonably rely upon to determine any value in W.M. Barr." Husband's testimony with respect to this asset is short; he did not testify as to his opinion of value or offer any proof in that regard. Husband's brief contains a "Marital Balance Sheet," in which he lists the value at $0; contrary to the requirement of Rule 7 of the Rules of the Court of Appeals, he does not cite to testimony in support of the value. We have reviewed the testimony and exhibits cited in his brief and conclude the evidence does not preponderate against the court's valuation of his security interest in the royalties generated by the patent as of the date of trial. Mr. Vance's opinion is supported by evidence in the record, and we discern no error in the valuation of this asset.

### d.) CGN Energy, LLC

Husband invested $150,000 in CGN Energy during the pendency of the divorce.[9] Mr. Vance found evidence of this investment during discovery and sought more information from Husband about the investment; Husband did not provide any information. In light of Husband's failure to respond, Mr. Vance used the initial investment as his opinion of value of the asset. For his part, Husband testified that due to the decrease in crude oil prices from $80 a barrel to $40 a barrel, he has received no income from the investment and that therefore the fair market value of his investment is $0.[10] The trial court valued the asset in accordance with the opinion of Mr. Vance,

---

[9] On appeal, Husband's brief states that he "invested $150,000 for a twenty-five percent interest in an oil well in Brookhaven, Mississippi." This statement is not supported by citation to the record, and in the portions of the record to which he cites, Husband provided no testimony about the nature of the company or its location.

[10] In the course of his cross examination Mr. Vance was asked his opinion as to the effect of a drop in oil prices on the value of the investment and engaged in the following colloquy:

Q. Okay. So when you looked at the value that Mr. Lucchesi, the investment that he put into this oil investment and taking into consideration that oil prices have dropped considerably over the last couple of years, do you still believe that the fair market value of his interest in CGN is what he invested before the prices dropped?
A. Well, I don't know. I don't know what kind of oil investment that it was. Was it an oil well, was it oil drilling, was it oil rigs, was it offshore. I mean, I don't know what it was because the information wasn't provided.
Q. Okay. You would agree that if it was in the -- centered around and dependent upon the prices of oil, that it's probably not worth what it was when the oil prices were higher?
A. I wouldn't agree with that. If he bought oil futures expecting oils to go down, they would have tripled his investment.
Q. But do you have any indications that this was futures?
A. No. But your question was just oil prices in general. And no, that's not necessarily true.
Q. Okay. But you would agree for CGN Energy, if it was associated with something other than futures and speculation but rather just the oil, dependent upon oil prices staying high or going higher and oil prices drop, they would not be worth the same value?

assigning a value of $150,000. Husband contends that, because Mr. Vance was not able to assess a fair market value to the investment, his opinion of value was "not based on generally accepted valuation methods," and the court erred in accepting the valuation.

This argument is unavailing. In formulating his opinion, Mr. Vance sought pertinent information from Husband as to the nature of the investment, which Husband refused to provide. In the absence of such information, Mr. Vance based his opinion of value on the amount of Husband's investment; we discern no infirmity in Mr. Vance's use of the amount of the initial investment as his opinion of value of this marital asset. To adopt Husband's argument would effectively reward him for his failure to produce the information which was sought by Wife; this court will not countenance such a result. Mr. Vance's opinion was factually based, inasmuch as the amount of Husband's investment is evidence of the value that Husband placed on the venture. Husband based his opinion of value on a drop in oil prices; his testimony, however, is perfunctory and unsupported by any articles, documents, or the testimony of his valuation expert. The trial court was presented with two opinions of the value of this asset and adopted Mr. Vance's. As Mr. Vance's opinion was within the range of values presented, the court was free to accept it. *See Watters*, 959 S.W.2d at 589.

e.) Investec 1407 Union Partnership

During the marriage Husband invested $50,000 into this partnership, which holds a ten percent ownership interest in an office building in Memphis. As with other assets for which Husband failed to provide requested information, Mr. Vance valued this asset at $50,000, the amount of Husband's investment. Husband contends that the recent loss of a major tenant has resulted in the value of his investment being only $5,000, and that the court should not have accepted Mr. Vance's opinion of value over his; he cites only his testimony in this regard. In the portion of the final decree in which the court sets a value for the marital property, with respect to this asset, the decree states "the current value of Investec is Fifty Thousand Dollars ($50,000)"; in the section of the decree dividing the marital assets, however, the court awarded this asset to Husband and listed the value as $10,000. For the reasons set forth previously relative to the court's adoption of Mr. Vance's opinions of value of assets as to which Husband refused to provide

---

A. If it was -- yes, if it was dependent on oil prices being higher or going higher and they dropped, I would agree, but that's only – that's all that it is dependent upon, then it possibly could have gone down, yes.
Q. Possibly or probably?
A. I don't know. I haven't been given the information on the company.

Husband's testimony as to the value of this asset was limited to a conclusory statement that there was a $40 drop in per barrel price of crude oil; this testimony does not preponderate against the finding by the court and would not support an alternative finding of value.

information, we affirm the valuation of the asset at $50,000, as that amount was within the range of values presented.[11]

### e.) LGR Beverage Group

The trial court adopted Mr. Vance's opinion that the value of this import company formed to market a vodka brand was $25,000, which was the amount of Husband's initial investment. As with other assets, Mr. Vance requested from Husband, but was not provided, additional information about this asset; he valued the asset at the amount of Husband's initial investment. Husband contends in his brief on appeal that the asset is worth "only $20,000." For the reasons set forth previously, and again giving deference to the court's adverse credibility finding with respect to Husband's testimony, we find no error in the court's valuation of this asset.

### f.) Southern Security Account 3690

The trial court found that this credit union account had a value of $134,334; the court ultimately divided the account equally. Husband argues that "the trial court erred in valuing the Southern Security account at $134,334.00 where the evidence clearly supports with greater convincing effect that the marital portion of the account is $40,000." The evidence to which Husband refers is his testimony that $40,000 of the $134,334 in the account belongs to him, with the remainder belonging to his partners in "the W.M. Barr deal." While it is not clear from the record or the briefs of the parties, it appears that the trial court accepted Husband's testimony in the portion of the final decree in which the court divides the marital property, wherein the court utilizes the amount of $40,000 as the amount or marital interest in the account to be divided. Wife does not cite to evidence preponderating against the court's valuation of the marital portion of this account as $40,000, and we are not persuaded that the court erred with respect to this account, inasmuch as the decree ultimately adopts the value Husband seeks.

### D. Alimony

In the final decree, the trial court made the following findings with respect to the award of alimony:

> The parties have been married for over twenty years, and Wife has not been employed full-time outside of the parties' home since the birth [of their son in October 2000].

---

[11] Our affirmance of the value adopted by the court pretermits our consideration of any issue presented by the court's listing of the asset at $10,000.

14

Wife is 53 years old and both spouses are in good physical health. Wife has monthly needs of approximately Twelve Thousand Dollars ($12,000), but has earning abilities of at least $2,500. Wife has transferable skills and training, but is the disadvantaged spouse and has needs that Husband has the ability to meet.

Husband has the ability to earn far more money than Wife.

No real proof was offered on the standard of living of the parties during the marriage, except that they had certain expenses. Wife is financially dependent upon Husband. The Divorce Referee found Husband's income to be in excess of Thirty Thousand Dollars ($30,000) per month at the Divorce Referee hearing on August 25, 2015, and this was later confirmed by this court. The court does find that Husband's income was reduced in 2015 by some $10,000, due to the issues with the Miracle Shields deal. However, the court finds that Husband is under employed to the amount of $100,000 as a consequence of refusing to accept a job with Delta Wholesale (Kahn). Additionally, the court finds that Husband has other undefined and undetermined income from investments and other elusive sources and amounts.

It is, therefore, found by this court that Husband's income shall be established and imputed at $27,000.00 per month. The court also takes into consideration that Husband expressed his plan to earn more income after the parties' divorce.

On May 23, 2016, during a hearing on Husband's failure to comply with Wife's discovery requests, this court reprimanded Husband for his failure to provide an accounting of his assets and business interests.

On July 7, 2016, following the May 23, 2016 hearing, Wife sent Husband's counsel a deficiency list containing numerous documents, many of which Husband never produced. As such, Husband's attempt to conceal the parties' assets and his repeated refusal to comply with Wife's discovery requests are compelling reasons for this court to award Wife alimony *in solido*.

***

The court finds that Wife will be forced to deplete her share of the marital estate unless Wife is awarded some form of alimony.

15

The parties' gross marital estate has been established at approximately $4,558,771. The court has awarded Wife some $1,662,438.50 in mostly liquid assets. Husband is awarded some $2,896,272.50 in a mixture of liquid assets and real property. This figure for Husband also includes a reduction of Wife's share of the assets by the $75,000 that would be considered his separate property.

The trial court initially awarded Wife $400,000 in alimony *in solido* but later amended its order *sua sponte*, awarding Wife "the total sum of $200,000 as alimony *in solido*, rather than a total of $400,000, to assist Wife with payment of litigation expenses incurred unnecessarily due to Husband's conduct of delay and failure to comply with repeated requests during the course of the trial." The Court continued, "Said sum of $200,000 as alimony *in solido* is not being awarded to Wife in the form of support. . . ." Wife appeals the award as being insufficient and an abuse of discretion because she "will most certainly have to deplete a considerable portion of the assets she received in the divorce just to pay her attorney fees." She asks this Court to award a total of $800,000 in alimony *in solido*, $500,000 of which she seeks "in lieu of alimony *in futuro*," and the other $300,000 to "offset Wife's attorney fees and suit expenses." Husband did not appeal the award of alimony or the finding that Wife has a need and that he has the ability to pay.[12]

Tennessee recognizes four distinct types of spousal support: (1) alimony *in futuro*, (2) alimony *in solido*, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1).[13] There are no hard and fast rules for spousal support

---

[12] In his reply brief, Husband argues that "despite the trial court's determining Husband's income was $27,000 per month, Husband's income will be substantially less after the division of the marital estate where the trial court considered Husband's investment income as part of his imputed income and where Wife received over two million dollars of the estate." Husband did not raise any issue relative to these findings or the award of alimony in his appeal. Consequently, we consider the matters he attempts to raise in his reply brief as waived. See Tenn. R. App. P. 13(b).

[13] Alimony *in futuro*, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 107 (Tenn. 2011). Alimony *in solido* is also "a form of long-term support," *id.* at 108, and "may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate." Tenn. Code Ann. § 36-5-121(d)(5). Rehabilitative alimony is "a separate class of spousal support," Tennessee Code Annotated section 36-5-121(e)(1), the purpose of which is "to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Gonsewski*, 350 S.W.3d at 108. Finally, transitional alimony may be awarded "when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded." Tenn. Code Ann. § 36-5-121(g)(1).

16

decisions. *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998); *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). In determining whether to award spousal support, the trial court is required to consider "all relevant factors." Tenn. Code Ann. § 36-5-121(i).[14] "While a trial court should consider all the relevant factors under the circumstances, the two most important factors to be considered are the need of the economically disadvantaged spouse and the obligor spouse's ability to pay." *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *3 (Tenn. Ct. App. Jan. 28, 2010) (citing *Riggs v. Riggs,* 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)). Of these two factors, "the primary consideration is the disadvantaged spouse's need." *Id.*

"[T]here is a statutory bias toward awarding transitional or rehabilitative alimony over alimony *in solido* or *in futuro*. While this statutory preference does not entirely displace long-term spousal support, alimony *in futuro* should be awarded only when the court finds that economic rehabilitation is not feasible and long-term support is necessary." *Gonsewski*, 350 S.W.3d at 109 (citing *Bratton v. Bratton,* 136 S.W.3d 595, 605 (Tenn. 2004); *Robertson v. Robertson,* 76 S.W.3d 337, 341-42 (Tenn. 2002)). In this context, "rehabilitated" means that, with reasonable efforts, the economically-disadvantaged spouse will be able to achieve:

---

[14] Those factors set forth in Tennessee Code Annotated section 36-5-121(i)are:

(1)     The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2)     The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)     The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)     The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)     Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

17

an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(e)(1).

The standard of review for an award of alimony was set forth in *Gonsewski v. Gonsewski:*

> [A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard,* 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew [v. Burlew],* 40 S.W.3d [465] at 470 [(Tenn. 2001)]; *Robertson v. Robertson,* 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard,* 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent,* 211 S.W.3d 216, 220 (Tenn.2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson,* 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.,* 318 S.W.3d 328, 335 (Tenn. 2010).

350 S.W.3d 99, 105 (Tenn. 2011) (footnote omitted).

We agree with Wife that, on the record presented, the amount of alimony awarded is insufficient. "An award of attorney's fees in divorce cases is treated as a form of spousal support, and the award is characterized as alimony in solido." *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001) (citing *Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999); *Anderton*, 988 S.W.2d at 682; *Smith v. Smith*, 984 S.W.2d 606 (Tenn. Ct. App. 1997); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988)). "These awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or would be required to deplete his or her resources in order to pay these expenses." *Riggs v. Riggs*, 250 S.W.3d 453, 459–60 (Tenn. Ct. App. 2007) (citations omitted). The court found that Wife would deplete her share of the

18

marital estate unless she was awarded some form of alimony, and accordingly awarded her alimony *in solido*; the $200,000 awarded, however, was contrary to the proof that her counsel fees were $272,000 as of the time of trial. Based upon the division of property in this case, it appears that, in order to pay her attorney's fees Wife would deplete a significant amount of her resources. Accordingly, it is appropriate that the award of alimony *in solido* be increased to $300,000, to cover the amount of attorney's fees and costs Wife incurred.

In addition, we note that, despite the court's finding that Wife has a monthly need of $12,000 and an earning ability of $2,500 per month, and that she has transferable skills and training, the court did not consider whether an award of short term alimony would be appropriate. Wife testified that, prior to the marriage and birth of the parties' child, she was a special education teacher; after the child's birth in 2000, she received an associate's degree in information technology and began to sell real estate part-time in 2003, earning up to $20,000 per year. The record supports further inquiry as to whether an award of rehabilitative and/or transitional alimony would be appropriate. If rehabilitation of Wife is feasible, the court should determine the amount and duration of such award, and whether an award of transitional alimony is also appropriate. If the court determines that rehabilitative or transitional alimony is not appropriate, the court should consider an additional award of long term support, in light of Wife's demonstrated need.

### E. Fees on Appeal

Wife requests her attorney's fees on appeal, a decision that is within our discretion. *See Seaton v. Seaton,* 516 S.W.2d 91, 93-94 (Tenn. 1974); *Davis v. Davis,* 138 S.W.3d 886, 890 (Tenn. Ct. App. 2003). In light of our disposition of this appeal and Wife's need and Husband's ability to pay, we award Wife her fees incurred in this appeal.

## IV. CONCLUSION

For the foregoing reasons, we affirm the court's classification, valuation, and division of marital assets, with the exception of the unnamed condominium; we vacate the court's order in that regard and remand for further findings, valuation, and division, if necessary. We modify the award of alimony *in solido* to increase the award to $300,000; we remand for further consideration of whether an additional award of rehabilitative or transitional alimony is warranted.

RICHARD H. DINKINS, JUDGE

19